**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CONSOL ENERGY INC.; CONSOL OF KENTUCKY INC.; ISLAND CREEK COAL COMPANY; LAUREL RUN MINING COMPANY; AND CNX LAND LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| SOUTHEASTERN LAND, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**

The Plaintiffs CONSOL Energy Inc. ("CONSOL") and Sellers CONSOL of Kentucky Inc., Island Creek Coal Company, Laurel Run Mining Company, and CNX Land LLC (collectively "Sellers") (and with CONSOL, collectively "Plaintiffs"), by their attorneys Reed Smith, LLP, set forth the following as their Complaint against the Defendant Southeastern Land, LLC ("Southeastern").

**Nature of the Action**

1.      This is an action for breach of contract arising from a Purchase and Sale Agreement for Miller Creek Assets and Reserves (the "Sales Agreement") dated July 19, 2016, the First Amendment to the Purchase and Sale Agreement dated August 1, 2016 (the "First Amendment"), and several associated agreements dated August 1, 2016, including a Permit Operating Agreement, a Master Equipment Sublease, a Transition Services Agreement, and a Diesel Fuel Purchase Agreement.[1]

---

[1]      The Permit Operating Agreement was Exhibit D to the Sales Agreement.  The Transition Services Agreement was Exhibit G to the Sales Agreement.  The Master Equipment

2.      True and accurate copies of the Sales Agreement, the First Amendment, Permit Operating Agreement, Master Equipment Sublease, Transition Services Agreement, and Diesel Fuel Purchase Agreement are attached as **Exhibits 1-6**, respectively.

3.      Since on or about August 1, 2016, Southeastern has operated all of the coal mining operations conveyed by the Sellers through the Sales Agreement.

4.      Among its many failings, Southeastern did not comply with its contractual obligations under the Sales Agreement and Permit Operating Agreement to effectuate the transfer of the operating permits for the conveyed mining operations by the agreed deadline. Southeastern failed to transfer the majority of the permits by the agreed deadline and, to date, Southeastern still has not fulfilled all of its permit transfer obligations under the Sales Agreement and Permit Operating Agreement.

5.      Plaintiffs bring this Complaint to recover damages for Southeastern's failure to transfer the permits and Southeastern's failure to make several categories of payments owed under the Sales Agreement and the associated Permit Operating Agreement, the Master Equipment Sublease, Transition Services Agreement, and Diesel Fuel Purchase Agreement.

### The Parties

6.      CONSOL Energy Inc. is a Delaware corporation with its principal place of business at 1000 CONSOL Energy Drive, Canonsburg, PA.

7.      CONSOL of Kentucky Inc. is a Delaware corporation with its principal place of business at 1000 CONSOL Energy Drive, Canonsburg, PA.

8.      Island Creek Coal Company is a Delaware corporation with its principal place of business at 1000 CONSOL Energy Drive, Canonsburg, PA.

---

Sublease was Exhibit L to the Sales Agreement.  The Diesel Fuel Purchase Agreement was Exhibit I to the First Amendment.

9.      Laurel Run Mining Company is a Virginia corporation with its principal place of business at 1000 CONSOL Energy Drive, Canonsburg, PA.

10.     CNX Land LLC is a Delaware limited liability company with its principal place of business at 1000 CONSOL Energy Drive, Canonsburg, PA.

11.     Southeastern Land, LLC is a Kentucky limited liability company with its principal place of business in Lovely, Kentucky.

## Jurisdiction And Venue

12.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a) in that this action is between citizens of different states and the matter in controversy exceeds, exclusive of interest and costs, the amount of $75,000.

13.     This Court has personal jurisdiction over Southeastern because, among other things, Southeastern regularly conducts business in this judicial district, including those acts and omissions that give rise to the causes of action set forth herein.  Moreover, the Sales Agreement and associated agreements at issue, to which Southeastern is a party, in part were negotiated and executed in Pennsylvania.  Additionally, the failure of Southeastern to transfer the permits as required under the Sales Agreement and Permit Operating Agreement presents an immediate risk of irreparable harm to the Plaintiffs' businesses that are located in this district.  Indeed, Southeastern's failure to transfer the permits seasonably resulted in two permit blocks on Plaintiffs that temporarily prevented them from obtaining permits and completing certain construction work.  Further, all notices, communications, and payments relating to the Sales Agreement (Section 12.2) and Permit Operating Agreement (Section 17) are due to the Plaintiffs in this district.  Also, as alleged herein, payments that Southeastern failed to render to the Plaintiffs as required by the other agreements at issue – the Master Equipment Sublease, Transition Services Agreement, and Diesel Fuel Purchase Agreement – were due and payable in

this district.

14.    Venue is proper pursuant to 28 U.S.C. §1391(b)(2) in that a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this district.

## The Agreements At Issue

15.    The Sellers and Southeastern executed the Sales Agreement dated July 19, 2016. *See Exhibit 1* (Sales Agreement, including relevant appendices and exhibits, and omitting certain exhibits and schedules).

16.    The Sales Agreement conveyed certain specified rights and obligations to Southeastern pertaining to the Sellers' Miller Creek Operations in Logan and Mingo Counties, West Virginia, which included:  (1) real property, including surface property, coal, and substances produced in association with coal; (2) land agreements, including easements, permits, licenses, rights-of-way, and surface leases; (3) coal leases and leasehold estates, including mining and access rights; (4) permits relating to mining operations (upon the requisite approvals of applicable government bodies); and (5) associated contracts, personal property, and records (collectively, the "Purchased Assets").  *See* Sales Agreement ¶ 2.1.[2]

17.    Sellers and Southeastern executed a First Amendment to the Sales Agreement on August 1, 2016.  *See Exhibit 2* (First Amendment to the Sales Agreement with appendices, exhibits, and schedules omitted).

18.    Paragraph 6.2 of the Sales Agreement obligated Southeastern to execute and thereafter comply with the terms of the Permit Operating Agreement.  *See Exhibit 3* (Permit Operating Agreement).

19.    In connection with the Sales Agreement, CONSOL of Kentucky and

---

[2]    The Sales Agreement is governed by Delaware law, except for matters of real property law, which are governed by West Virginia law.  *See* Sales Agreement ¶ 12.9.

Southeastern executed the Master Equipment Sublease under which Southeastern rented

Caterpillar-branded equipment from CONSOL of Kentucky, as described in Schedule 1 to the

Master Equipment Sublease.  *See Exhibit 4* (Master Equipment Sublease).

20.      In connection with the Sales Agreement, Sellers and Southeastern executed a

Transition Services Agreement under which Sellers (or their affiliates) would provide certain

Services (as the term is defined therein) to Southeastern relating to the Purchased Assets during a

limited post-Closing transition period.  *See Exhibit 5* (Transition Services Agreement).

21.      In connection with the First Amendment to the Sales Agreement, CONSOL and

Southeastern executed a Diesel Fuel Purchase Agreement under which CONSOL agreed to sell

and Southeastern agreed to purchase specific monthly fuel quantities.  *See Exhibit 6* (Diesel Fuel

Purchase Agreement).

## Southeastern Failed To Transfer Purchased Permits

22.      The Permit Operating Agreement provides that Southeastern is obligated to take

a number of specified measures to become the permittee for each of the permits that were

conveyed by the Sales Agreement (the "Purchased Permits"), which were identified in Exhibit A.

*See* Permit Operating Agreement ¶ 2.

23.      Among other things, the Permit Operating Agreement requires Southeastern to

file applications to transfer the Purchased Permits and prioritizes the schedule by which

Southeastern was to submit the permit transfer applications as well as the permits themselves.

*See* Permit Operating Agreement ¶ 9(a).

24.      In addition, the Permit Operating Agreement prescribed certain time periods for

action by Southeastern based upon the categories of permits.  For the two "Priority Permits" in

Exhibit A-1, Southeastern was required to submit permit transfer applications no more than two

business days after closing.  *See* Permit Operating Agreement ¶ 2(a).

25.     For the "Remaining Permits" identified in Exhibit A-2 of the Permit Operating Agreement, Southeastern was obligated to submit permit transfer applications within 30 business days of closing.  *See id.*

26.     For the "Powellton and IBR Permits" identified in Exhibit A-3 of the Permit Operating Agreement, Southeastern was required to submit permit transfer applications no later than 30 days after the date on which Sellers or the West Virginia Department of Environmental Protection ("WVDEP") advised that the necessary approval had been obtained by Sellers so that Southeastern could begin the process of transferring the Powellton and IBR Permits.  *See id.*

27.     Southeastern further covenanted, without qualification, that it would take "all actions necessary" to submit the transfer applications within these time periods.  *See* Permit Operating Agreement ¶ 9(a).

28.     After submitting the transfer applications, Southeastern agreed to "diligently prosecute" the transfer application process and covenanted to take "all commercially reasonable action necessary" to accomplish the transfers and bond replacements by December 31, 2016 (the "Transfer Deadline").  *See* Permit Operating Agreement ¶¶ 2(c) & 9(a).

29.     Southeastern failed to transfer several of the Purchased Permits before the Transfer Deadline in violation of the Sales Agreement and the Permit Operating Agreement. Indeed, there are still Purchased Permits that have not transferred.  This is a result of Southeastern's failure to diligently prosecute the transfers by taking all commercially reasonable steps as required by ¶¶ 2(c) and 9(a) of the Permit Operating Agreement.

**Southeastern Failed To Pay Bond Premiums Under The Permit Operating Agreement**

30.     Sellers have incurred actual losses as a result of Southeastern's failure to transfer the Purchased Permits seasonably.

31.     Paragraph 8 of the Permit Operating Agreement obligated Southeastern to pay all

of the Sellers' costs associated with maintaining the bonds posted for each of the Purchased

Permits that were not transferred by the Transfer Deadline of December 31, 2016.

32.     Because Southeastern failed to timely transfer various permits, Sellers have been

required to maintain bonds of more than $37 million for the permits that were not transferred by

the Transfer Deadline of December 31, 2016, at a cost of more than $100,000 ("Bond

Premiums").

33.     Southeastern has not reimbursed Sellers for those Bond Premiums.

### Southeastern Failed To Pay Permit Transfer Penalties Under The Permit Operating Agreement

34.     Under Paragraph 9(c) of the Permit Operating Agreement, Southeastern agreed to

pay monthly Permit Transfer Penalties for all Purchased Permits that were not transferred,

beginning on July 1, 2017:

> Transferee shall pay Transferor an amount equal to the product of (i) one hundred fifty thousand dollars ($150,000) times (ii) a fraction, the numerator of which is the aggregate face amount of Bonds posted with respect to Purchased Permits for which the Penalty Deadline has passed and Transfer Approval has not been obtained, in each case, as of such date and the denominator of which is the aggregate face amount of Bonds posted with respect to all Purchased Permits as of the date of this Permit Agreement, as set forth on *Exhibit A*; *provided however,* the Penalty Deadline for a particular Purchased Permit shall be tolled on a day-for-day basis for each day that Transferee's ability to receive the applicable required Transfer Approval is delayed for any reason other than Transferee's breach of its obligations under this Permit Agreement.

35.     The aggregate face amount of the Bonds posted with respect to all Purchased

Permits exceeds $37 million.  As of the Penalty Deadline, the aggregate face amount of the

Bonds posted with respect to the Purchased Permits for which the Transfer Approval was not

obtained exceeded $26 million.  Southeastern still has not obtained Transfer Approvals for all of

the Purchased Permits for which Bonds have been posted.

36.     Southeastern has failed to pay more than $100,000 in Permit Transfer Penalties.

**Southeastern Failed To Pay Caterpillar Rent And Taxes Due Under**
**The Master Equipment Sublease**

37.     Under Section 6.01 and Schedule 1 of the Master Equipment Sublease, Southeastern agreed to pay $308,230.21 per month to sublease certain Caterpillar-branded equipment leased by CONSOL of Kentucky (the "Caterpillar Rent") as well as interest on all unpaid amounts.

38.     Under Section 6.1(d) of the Master Equipment Sublease, any amounts unpaid by the 28th of each month shall accrue interest.

39.     As of the filing of this Complaint, Southeastern has not paid any Caterpillar Rent or interest owed under the Master Equipment Sublease.

40.     Further, pursuant to Section 6.03 of the Master Equipment Sublease, Southeastern agreed to pay a late charge equal to five percent (5%) of the Base Rent payment, in the event that Southeastern failed to pay any amount payable under the Master Equipment Sublease within five (5) calendar days of such payment's due date.  Southeastern has not paid any late charges.

41.     Additionally, Section 10.03 of the Master Equipment Sublease obligated Southeastern to pay and indemnify CONSOL of Kentucky for all taxes associated with the Caterpillar Equipment.  CONSOL of Kentucky has paid more than $100,000 in property taxes on the Caterpillar Equipment and invoiced Southeastern for those amounts.  Southeastern has failed to reimburse CONSOL of Kentucky for those amounts.

**Southeastern Failed To Pay Services Fees Due Under The Transition Services Agreement**

42.     Under Section 2.1 and Exhibit A of the Transition Services Agreement, Southeastern agreed to pay the agreed-upon Services Fees for certain Services (as such terms are defined therein).

Upon the execution of this Agreement, Buyer shall, in addition to other amounts owed under this Agreement and the Purchase Agreement, pay to Seller the service

- 8 -

component monthly fee for the Services as set forth on Exhibit A on (collectively, the "Services Fee") for the Services to be performed by or on behalf of Seller pursuant to this Agreement.

43.     Section 2.1 of the Transition Services Agreement also obligated Southeastern to pay interest of 8% per annum for any payments made after the due dates for the Services Fees.

> For purposes of this Section 2.1, any amount not received on or before the date due shall bear interest at a rate equal to eight percent per annum from the date due until the date paid in full.  Notwithstanding anything herein to the contrary, Seller shall at no time be obligated to make any expenditure or advance any funds on behalf of Buyer or its Affiliates to perform the Services

44.     In 2016, Sellers invoiced Southeastern for Services Fees in excess of $100,000. Southeastern has not paid all of the outstanding Services Fees and has not paid the interest owed on those amounts.

### Southeastern Failed To Make Production Royalty And Tax Payments Due Under The Transition Services Agreement

45.     Pursuant to Section 2.1 and Exhibit A of the Transition Services Agreement, Sellers agreed to provide certain Services in consideration of Southeastern's reimbursement of the Reimbursable Expenses (as such term is defined therein).

46.     As part of the Services, Sellers agreed to "pay on behalf of [Southeastern] all royalties and taxes payable by [Southeastern] during Service Term including mineral, real estate and personal property taxes, all such payments to be Reimbursable Expenses" (the "Production Royalty And Tax Payments").  *See id.*

47.     Under Section 2.1 of the Transition Services Agreement, "any amount not received on or before the date due shall bear interest at a rate equal to eight percent per annum from date due until the date paid in full."

48.     Sellers have made more than a million dollars in in Production Royalty And Tax Payments on behalf of Southeastern, and that were reimbursable by Southeastern as

Reimbursable Expenses.  These Royalty And Tax Payments were identified to Southeastern on multiple invoices.

49.     Southeastern has not reimbursed Sellers for the Production Royalty And Tax Payments and has not paid the interest owed on those amounts.

**Southeastern Did Not Pay Cisco Equipment Fees Owed Under**
**The Sales Agreement and Transition Services Agreement**

50.     Pursuant to the First Amendment to the Sales Agreement and the Transition Services Agreement, Southeastern agreed to buyout certain Cisco equipment owned by CONSOL for a set fee (the "Cisco Equipment Fees").

51.     As of December 2016, the unpaid Cisco Equipment Fees owed by Southeastern were $11,715.64.  Southeastern has not paid the outstanding amounts.

**Southeastern Failed To Pay Amounts Due Under The Diesel Fuel Purchase Agreement**

52.     Under the Diesel Fuel Purchase Agreement, Southeastern agreed to purchase from CONSOL "a fixed quantity of 252,000 gallons per month (the "Monthly Fuel Quantity") of #2 Ultra Low Sulphur diesel fuel (or a suitable alternative)."  *See Exhibit 6* at ¶¶ 1-4.

53.     In 2016 and 2017, CONSOL invoiced Southeastern for diesel fuel charges, which Southeastern failed to pay.

54.     To date, Southeastern has failed to pay in excess of a million dollars invoiced by CONSOL under the Diesel Fuel Purchase Agreement.

**Plaintiffs Are Entitled To Recover Attorneys' Fees And Expenses**

55.      Plaintiffs are entitled to recover attorneys' fees and expenses under the parties' agreements.

56.     Paragraph 10.2(b) of the Sales Agreement obligates Southeastern to indemnify Sellers and their Affiliates for "all Losses resulting from, relating to, arising out of or incurred

in connection with," *inter alia*, "[a]ny breach" by Southeastern of its obligations "contained in this Agreement or the Transaction Documents."  Paragraph 10.2 of the Sales Agreement defines "Losses" to include Sellers' (or their Affiliates') reasonable attorneys' fees, court costs, and other "costs and expenses of investigating…asserting, presenting or enforcing any of its respective rights" under the Sales Agreement.  The "Transaction Documents" are defined to include, in relevant part, the Permit Operating Agreement, the Transition Services Agreement, the Master Equipment Sublease (a.k.a., the "CAT Equipment Lease") and "all other ancillary instruments and documents executed by one or more of the Parties at or in connection with the Closing or in performance of any post-Closing action required under or in furtherance of this Agreement."  *See* Sales Agreement Appendix I (Definitions) at p. 11.  The Diesel Fuel Purchase Agreement is one such "ancillary instruments and documents" executed in connection with the Closing of the Transaction.

57.     Sellers have incurred recoverable attorneys' fees, expenses, and costs in connection with Southeastern's breaches of the Sales Agreement and the Transaction Documents, as alleged herein, and in enforcing their rights under such agreements.

58.     Paragraph 12.22 of the Sales Agreement further provides that the prevailing party in any suit to enforce the obligations under the agreement shall be entitled to recover its attorneys' fees:

> In the event suit or action is instituted to interpret or enforce the terms of this Agreement or to rescind this Agreement, the prevailing Party shall be entitled to recover from the other Party such sum as the court may adjudge reasonable as attorneys' fees at trial, on any appeal, and on any petition for review, and in any bankruptcy proceedings related to this Agreement, in addition to all other sums provided by law.

59.     Sellers have incurred recoverable attorneys' fees in connection with their pursuit of their claims under the Sales Agreement against Southeastern.

60.     Additionally, under Paragraph 17.01(d) of the Master Equipment Sublease provides that Southeastern shall indemnify CONSOL of Kentucky and its affiliates against "all Damages relating to/arising out of or resulting from any claim of … [CONSOL of Kentucky] arising out of or relating to … any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by [Southeastern] pursuant to this Agreement."  Article I of the Master Equipment Sublease defines "Damages" to include, *inter alia*, "reasonable attorneys' fees and the cost of enforcing any right to indemnification under this Agreement."

61.     CONSOL of Kentucky has incurred attorneys' fees and costs in connection with enforcing the Master Equipment Sublease.

62.     Further, under Paragraph 6 of the Diesel Fuel Purchase Agreement, Southeastern agreed to indemnify CONSOL for "any damages, loss, cost of liability (including legal fees and the cost of enforcing this Agreement) arising out of or resulting from a breach of this Agreement by [Southeastern]."

63.     CONSOL has incurred attorneys' fees and costs in connection with enforcing the Diesel Fuel Purchase Agreement.

### Southeastern's Agreement To Set Off Certain Amounts Owed To Plaintiffs Against A Promissory Note Issued In Connection With The Fola Transaction

64.     Pursuant to Paragraph 3.1 of the Sales Agreement, the purchase price for the Purchased Assets was credited against funds owed to Southeastern in connection with a transaction in which various CONSOL affiliates as sellers (the "Fola Sellers") conveyed operations in Clay, Fayette, and Nicholas Counties, West Virginia to Southeastern (the "Fola Transaction"), and which closed simultaneously with the Miller Creek Sales Agreement. *See* Sales Agreement ¶ 7.1(k) and Appx. I (Definitions) at p. 4.

65.     The Fola Sellers delivered to Southeastern a promissory note dated August 1,

2016 for the closing payment that was guaranteed by CONSOL (the "Promissory Note").

66.    The Plaintiffs acknowledge that they have the right to set off certain amounts owed to them by Southeastern against amounts owed by the Fola Seller to Southeastern under the Promissory Note.

67.    As of December 30, 2016, Southeastern owed in excess of $4,143,069.76 to Sellers and the Fola Sellers under the various agreements in 2016.

68.    As confirmed in the December 30, 2016 letter, the parties agreed to set off certain amounts owed by Southeastern against a $3.5MM payment otherwise due to Southeastern under the Promissory Note on January 1, 2017.

69.    As of December 29, 2017, Southeastern owed Sellers and Fola Sellers in excess of $643,069.76 arising from obligations incurred in 2016 (the "2016 Carryover Obligations"), and in excess of $5,041,131 in amounts due under the various agreements in 2017.

70.    As confirmed in the December 29, 2017 letter, the parties agreed to set off certain amounts owed by Southeastern against the $4.5MM payment otherwise due to Southeastern under the Promissory Note on January 1, 2018.

71.    However, the foregoing setoff agreements did not account for all amounts owed by Southeastern to Plaintiffs at the end of 2017 and did not account for any amounts that have accrued and Southeastern has not paid in 2018.  Southeastern remains in breach of its payment obligations under the parties' agreements.

72.    In addition, the Sales Agreement included a covenant by Southeastern in Paragraph 6.2 to fund an account at Huntington Bank to secure the payment of all of the obligations related to the Purchased Permits and Replacement Bonds under or relating to the Sales Agreement and/or the Permit Operating Agreement during the Interim Period:

To secure the full and punctual payment and performance by Buyer of all present and future obligations, liabilities, covenants and agreements required to be observed and performed or paid or reimbursed by Buyer relating to (i) the Purchased Permits and Replacement Bonds under or relating to this Agreement and/or the Permit Operating Agreement during the Interim Period and (ii) the Cotiga South Lease under or relating to this Agreement, in each case, including all costs, expenses and fees (including the reasonable fees and expenses of Seller's counsel) in any way relating to the enforcement of Seller's rights under this Agreement or the Permit Operating Agreement, as applicable (collectively, the "Secured Obligations"), Buyer hereby grants Seller a lien and continuing security interest in and to all of its right, title and interest in and to a deposit account to be established on or before the Closing Date at The Huntington National Bank, a national banking association, which is to provide security for the Secured Obligations, and agrees to enter into a Deposit Account Control Agreement ("DACA" or "Deposit Account Control Agreement") in the form of Exhibit K attached hereto. In the event that Buyer fails to timely perform the Secured Obligations, Seller may, after any notice required by, and any cure period provided for in, this Agreement or the Permit Operating Agreement, resort to the funds in the said deposit account to satisfy, and reimburse, the costs and expenses incurred by Seller as a result thereof.

73.     Paragraph 6.2 of the Sales Agreement also granted the Sellers a lien and

continuing security interest in the funds in the Huntington Bank account and the right to resort

to those funds to satisfy its relevant costs and expenses.

74.     While the Sellers have not yet exercised their right to access the funds in the

Huntington Bank account, they reserve their right to do so at the appropriate time.

## COUNT I
### BREACH OF CONTRACT – SALES AGREEMENT AND PERMIT OPERATING AGREEMENT
### DAMAGES FOR BOND PREMIUMS AND PERMIT TRANSFER PENALTIES
### (Plaintiffs v. Southeastern)

75.     Plaintiffs incorporate each of the allegations contained in paragraphs 1 through 74

above as if fully set forth herein.

76.     The Sellers and Southeastern entered into a legally binding Sales Agreement on

July 19, 2016 and entered into a legally binding Permit Operating Agreement on August 1,

2016.

77.    Southeastern materially breached its obligations under the Sales Agreement and Permit Operating Agreement to transfer all of the Purchase Permits by the deadlines set forth in those agreements.

78.    As a direct and proximate result of Southeastern's repeated breaches of the Sales Agreement and Permit Operating Agreement, the Plaintiffs have incurred substantial damages.

79.    Under Paragraph 8 of the Permit Operating Agreement, Southeastern agreed to reimburse Sellers for bond premiums paid to maintain permits that were not transferred timely.

80.    Sellers have maintained bonds worth millions of dollars for the permits that have not yet been transferred.

81.    By failing to reimburse Sellers for these bond premiums, Southeastern breached the Permit Operating Agreement and caused Plaintiffs to incur damages in excess of $100,000.

82.    Southeastern also is in breach of its obligation under Paragraph 9(c) of the Permit Operating Agreement to pay Permit Transfer Penalties each month beginning on July 1, 2017.

83.    Southeastern currently owes more than $100,000 in Permit Transfer Penalties.

84.    By failing to pay Permit Transfer Penalties, Southeastern breached the Permit Operating Agreement and caused Plaintiffs to incur hundreds of thousands of dollars in damages.

85.    Additionally, Southeastern is liable to Sellers for the attorneys' fees, expenses, interest, and costs they have incurred in connection with this action under Paragraphs 10.2(b) and 12.22 of the Sales Agreement.

**COUNT II**
**BREACH OF CONTRACT – MASTER EQUIPMENT SUBLEASE**
**DAMAGES FOR CATERPILLAR RENT AND TAXES**
**(CONSOL of Kentucky v. Southeastern)**

86.    Plaintiffs incorporate each of the allegations contained in paragraphs 1 through 85

above as if fully set forth herein.

87.   CONSOL of Kentucky and Southeastern entered into a legally binding Master

Equipment Sublease on August 1, 2016.

88.   Pursuant to Section 6.01 and Schedule 1 of the Master Equipment Sublease,

Southeastern agreed to pay $308,230.21 per month to sublease certain Caterpillar equipment

from CONSOL of Kentucky.

89.   To date, Southeastern has failed to pay any Caterpillar Rent, and has not paid any

of the associated interest and late charges.

90.   In addition, CONSOL of Kentucky has paid taxes associated with the Caterpillar

Equipment and sought reimbursement under Section 10.03 of the Master Equipment Sublease.

Southeastern has failed to reimburse CONSOL of Kentucky for those amounts.

91.   Accordingly, Southeastern's breaches of the Master Equipment Sublease has

caused CONSOL of Kentucky to incur millions of dollars in damages.

92.   Southeastern also is liable to CONSOL of Kentucky for the attorneys' fees,

expenses, and costs it has incurred in enforcing the Master Equipment Sublease under Paragraph

17.01(d) thereto and under Paragraphs 10.2(b) and 12.22 of the Sales Agreement.

## COUNT III
### BREACH OF CONTRACT – TRANSITION SERVICES AGREEMENT
### DAMAGES FOR SERVICES FEES, PRODUCTION ROYALTY AND TAX PAYMENTS,
### AND CISCO EQUIPMENT FEES
### (Sellers v. Southeastern)

93.   Plaintiffs incorporate each of the allegations contained in paragraphs 1 through 92

above as if fully set forth herein.

94.   The Sellers and Southeastern entered into a legally binding Transition Services

Agreement on August 1, 2016.

95.   Pursuant to Section 2.1 and Exhibit A of the Transition Services Agreement,

Southeastern agreed to pay Services Fees to Sellers and to reimburse Sellers for any Production Royalty And Tax Payments.

96.     Any Services Fees or Production Royalty And Tax Payments not reimbursed by the date due are subject to an eight percent per annum interest rate under Section 2.1 of the Transition Services Agreement.

97.     To date, Southeastern has failed to pay in excess of $100,000 in invoiced Services Fees and interest.

98.     To date, Sellers have made in excess of a million dollars in Production Royalty And Tax Payments that Southeastern has not reimbursed, and for which Southeastern has not paid any of interest.

99.     In addition, under the First Amendment to the Sales Agreement and the Transition Services Agreement, Southeastern agreed to buyout certain Cisco equipment owned by CONSOL for a set fee.

100.     To date, Southeastern has not paid $11,715.64 in Cisco Equipment Fees, and for which Southeastern has not paid any of interest.

101.     Accordingly, Southeastern has breached its obligations under the Transition Services Agreement to pay Sellers the agreed-upon Services Fees (plus interest), to reimburse Sellers for Production Royalty And Tax Payments (plus interest), to pay the Cisco Equipment Fees (plus interest), and has caused Sellers to incur damages.

102.     Southeastern also is liable to Sellers for the interest, attorneys' fees, expenses, and costs they have incurred in enforcing the Transition Services Agreement under Paragraphs 10.2(b) and 12.22 of the Sales Agreement.

<u>COUNT IV</u>
**BREACH OF CONTRACT – DIESEL FUEL PURCHASE AGREEMENT
DAMAGES FOR UNPAID FUEL QUANTITY PURCHASES
(CONSOL v. Southeastern)**

103.    Plaintiffs incorporate each of the allegations contained in paragraphs 1 through 102 above as if fully set forth herein.

104.    CONSOL and Southeastern entered into a valid Diesel Fuel Purchase Agreement on August 1, 2016.

105.    Under the Diesel Fuel Purchase Agreement, Southeastern agreed to pay CONSOL amounts invoiced for diesel fuel ordered by and delivered to Southeastern on a monthly basis.

106.    To date, Southeastern has failed to pay amounts invoiced by CONSOL under the Diesel Fuel Purchase Agreement.

107.    Accordingly, CONSOL has been damaged in excess of one million dollars by Southeastern's breach of its obligation to pay invoices issued under the Diesel Fuel Purchase Agreement.

108.    Southeastern also is liable to CONSOL for the attorneys' fees and costs it has incurred in connection with enforcing the Diesel Fuel Purchase Agreement under Paragraph 6 thereto and under Paragraphs 10.2(b) and 12.22 of the Sales Agreement.

WHEREFORE, the Plaintiffs respectfully request that the Court enter judgment in their favor and against Southeastern awarding the Plaintiffs all damages, fees, and costs sustained as a result of Southeastern's breaches of the Sales Agreement and associated agreements in an amount to be established through proof, including:

(1)    Bond Premiums and Permit Transfer Penalties under the Permit Operating Agreement (Count I);

(2)    Caterpillar Rent (plus late charges and interest) and Taxes (plus interest) under the Master Equipment Sublease (Count II);

(3)     Services Fees (plus interest), Production Royalty And Tax Payments (plus interest), and Cisco Equipment Fees (plus interest) under the Transition Services Agreement (Count III);

(4)     Monthly Fuel Quantity Purchases under the Diesel Fuel Purchase Agreement (Count IV);

(5)     Awarding the Plaintiffs pre-judgment interest and post-judgment interest;

(6)     Awarding the Plaintiffs their attorneys' fees, expenses, and costs incurred in connection with Southeastern's breaches of contract and Plaintiffs' pursuit of this action pursuant to the terms of the parties' contracts and/or applicable state law;

(7)     Awarding the Plaintiffs their costs of court; and

(8)     Awarding the Plaintiffs such other and further relief to which they may be entitled.


Dated:  June 1, 2018                              Respectfully submitted,


                                                  /s/ *John M. McIntyre*
                                                  John M. McIntyre, Pa. ID #78739
                                                  Patrick M. Emery, Pa. ID #306672
                                                  Aleksandra V. Phillips, Pa. ID # 309779
                                                  Reed Smith LLP
                                                  Reed Smith Centre
                                                  225 Fifth Avenue
                                                  Pittsburgh, PA  15222
                                                  Tel:  412.288.3131
                                                  jmcintyre@reedsmith.com
                                                  pemery@reedsmith.com
                                                  avphillips@reedsmith.com

                                                  *Counsel for Plaintiffs*